SCHABLIK and KNAPP, P.A.
35 Waterview Boulevard
1st Floor
Parsippany, New Jersey 07054
(973) 402-9596
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JOHN B. SHAFER, | : | Hon. Dickinson R. Debevoise, U.S.D.J. |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Civil Action** |
| | : | **No. 08-CV-02884 (DRD)** |
| UNITED GENERAL TITLE | : | |
| INSURANCE COMPANY, FIRST | : | |
| AMERICAN CORPORATION, | : | |
| FIRST AMERICAN TITLE | : | |
| INSURANCE COMPANY & | : | |
| GARY KERMOTT | : | |
| | : | |
| Defendants. | : | |

---

## BRIEF IN OPPOSITION TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S
## CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Of Counsel and on Brief:
*Noel E. Schablik, Esq.*

# TABLE OF CONTENTS

Page

INTRODUCTORY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . .   1

PERTINENT TERMS OF THE CONTRACT OF EMPLOYMENT . . . . .   2

CHRONOLOGY OF SIGNIFICANT EVENTS . . . . . . . . . . . . . . . . . . .   5

LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

POINT I . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

DEFENDANT IS NOT ENTITLED TO SUMMARY
JUDGMENT ON ITS MOTION AND PLAINTIFF IS
ENTITLED TO PARTIAL SUMMARY JUDGMENT
ON ITS CROSS-MOTION.

POINT II . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

NEW JERSEY LAW APPLIES TO THE
CONSTRUCTION AND ENFORCEMENT OF THE
WRITTEN EMPLOYMENT AGREEMENT.

POINT III . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

THE BONUS SUB-PART OF THE CONTRACT'S
SALARY DEFINITION IS AMBIGUOUS.

POINT IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

PARAGRAPH 3 OF THE EMPLOYMENT
AGREEMENT MUST BE INTERPRETED TO
PROVIDE THAT THE BONUS COMPONENT OF
PLAINTIFF'S ANNUAL SALARY WAS TO
RANGE BETWEEN 3 and 5 (%) PERCENT OF
AGENCY PROFIT SO AS TO PROVIDE HIM WITH
TOTAL ANNUAL COMPENSATION OF $350,000
TO $500,000.

i

POINT V      PLAINTIFF IS ENTITLED TO PARTIAL SUMMARY . . . . 29
                 JUDGMENT.

CONCLUSION              . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

## **TABLE OF AUTHORITIES**

### **CASES**

<u>Page</u>

Anderson v. Liberty Lobby, Inc.
      477 <u>U.S.</u> 242, 251, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986) ....    17

Atlantic Northern Airlines v. Schwimmer,
      12 <u>N.J.</u> 293 at 302 (1953)    . . . . . . . . . . . . . . . . . . . . .    19, 20

Bryson v. Brand Industries, Inc.,
      621 <u>F.2d</u> 556 (CA3rd 1980)    . . . . . . . . . . . . . . . . . . . . .    27

Celotex Corp. v. Catrett,
      477 <u>U.S.</u> 317, 323 (1986)    . . . . . . . . . . . . . . . . . . . . .    17

Conway v. 187 Corporate Center Associates,
      187 <u>N.J.</u> 259 at 269 (2006)    . . . . . . . . . . . . . . . . . . . . .    19, 20

Copelco Capital, Inc. v. Shapiro,
      331 <u>N.J. Super.</u> 1, 5 (App. Div. 2000)    . . . . . . . . . . . . . . . . . . . . .    18

Feldman v. U.S.Sprint Communications Co.,
      714 et. seq. 727 (D.N.J. 1989)    . . . . . . . . . . . . . . . . . . . . .    25

Kearny PBA and Local #21 v. Town of Kearny,
      81 <u>N.J.</u> 208, 221, 405 A.2d., 393 (1979)    . . . . . . . . . . . . . . . . . . . . .    19

In re: Miller,
      90 <u>N.J.</u> 201, 221 (1982)    . . . . . . . . . . . . . . . . . . . . .    19

Charles W. Mellon v. Control Data Corporation,
      243 <u>N.J. super.</u> 420 (App. Div. 1990)    . . . . . . . . . . . . . . . . . . . . .    25

Miller v. Eisele, 111 N.J.L,
     268, 276, 168 A. 426 (E & A 1933) ......................................     29

Nolan v. Control Data Corporation,
     supra, 243 N.J. Super. at 431     .........................................     21, 28

Quinta v. Accenture, LLP,
     Slip Op. At p. 5, 2008 WL 485, 2934 (D.N.J. 2008) ..........     17

Russell v. Princeton Laboratories, Inc.,
     50 N.J. 30 (1967)     .........................................     25

Sons of Thunder, Inc. v. Borden, Inc.,
     148 N.J. 396 at 420 (1997)     .........................................     19

Wolf v. Marlton Corp.,
     57 N.J. Super. 278, 287, 154 A2d. 625 (1959) ......................     29

iii

## INTRODUCTORY STATEMENT

This dispute arises under a written contract of employment between plaintiff, John Shafer, and defendant, United General Title Insurance Company (hereafter "UGT"). The basic form of contract was criticized by defendant's, First American Title Insurance Company's senior vice-president and general counsel on March 10, 2007. Mr. Sullivan, in an e-mail to defendant Gary Kermott and defendant Joe Drum and others, wrote as follows:

> *[I advise] against further use of the UGT contracts that were prepared from the 'employee' perspective. The contract language makes the termination process difficult both from determining the grounds for termination and the calculation of any benefit that may be owed the employee upon termination.* Based on the recent change of management of UGT, it would be surprising if the UGT 'form of contract' does not result in a significant negative impact on UGT's financial performance. (Emphasis added.)

(See Shafer Certification, **Exhibit "A"**.)

Even defendants' human resources manager, Anne Kulinski, criticized the specific form of contract. Kulinski testified at deposition that, "the contract [was] poorly drafted, particularly with respect to the bonus and post termination benefits clauses." (Deposition of Anne Kulinski annexed to the certification of Noel E. Schablik as **Exhibit "B,"** at pp.36.1 to 37.12)

Defendants' Chief Financial Officer, Michael Gallaher corroborated the ambiguity within the contract with respect to the bonus provision. Gallaher testified at deposition

1

that he could not calculate Plaintiffs's 2007 bonus based on the contract language, notwithstanding his intimate familiarity with the UGT's financial numbers. Gallaher had to consult Joe Drum, who was employed by UGT and plaintiff's immediate supervisor, to find out the bases for calculation of plaintiff's 2007 bonus. (Deposition of Michael Gallaher attached to certification of Noel E. Schablik as **Exhibit "D,"** at pp. 9.21 to 10.24, 37.21 to 38.5.)

## PERTINENT TERMS OF THE CONTRACT OF EMPLOYMENT

The contract of employment provides for an annual compensation package comprised of salary and bonus payments as follows:

> 3.   **Salary.**   During the Term, the Company shall pay the Employee a <u>minimum base annual salary</u>, before deducting all applicable withholdings, of $175,000.00 per year, payable at the times and in the manner dictated by the Company's standard payroll policies. Such minimum base annual salary may be periodically reviewed and increased (but not decreased) at the discretion of the Compensation Committee of the Board of Directors to reflect, among other matters, cost of living increases and performance results.
>
> (a) Bonus To Be Determined

(Shafer Certification, **Exhibit "B".**) Although the bonus language imposes a mandatory duty on UGT to pay a bonus, the bases and amount of the bonus cannot be determined from the contract language.

The contract also provides that the plaintiff will receive certain benefits, as follows:

2

      4.     **Other Compensation and Fringe Benefits.**   *In addition to any executive bonus, pension, and deferred compensation plans which the Company may from time to time make available to the Employee upon mutual agreement, the Employee shall be entitled to the following:*

      (a)     *The standard Company benefits enjoyed by the Company's other top executives;*

      (b)     *Provision by the Company during the Term and any extensions thereof to the Employee and his dependents of medical and other insurance under the Company's Medical Plan;*

      (c)     The Company shall deduct from all compensation payable under this Agreement to the Employee any taxes or withholdings the Company is required to deduct pursuant to state and federal laws or by mutual agreement between the parties.

      (d)     *The employee shall receive a car allowance of $750 per month.* (Emphasis added.)

In separate paragraphs the contract provides for four (4) weeks paid vacation, and reimbursement of expenses,

      5.     **Vacation.**   For and during each year of the Term and any extensions thereof, the Employee shall be entitled to four (4) weeks paid vacation.  In addition, the Employee shall be entitled to such holidays consistent with the Company's standard policies.

      6.     **Expense Reimbursement.**   In addition to the compensation and benefits provided herein, the Company shall, upon receipt of appropriate documentation, reimburse the Employee each month for his reasonable travel, lodging, entertainment, promotion and other ordinary and necessary business expenses.

Defendants interpreted the vacation provision to provide additional compensation at the salaried rate, for any unused vacation time. Thus, if the plaintiff did not use any vacation time he would be entitled to four (4) weeks' additional compensation at the annual salary rate of $176,800. (Shafer Certification, ¶53, Schablik Certification, **Exhibit "A"**, at pp. 8, 64 & 77.)

The financial rights and obligations of the parties in the event of termination are addressed at paragraph seven. This paragraph clearly distinguishes between the situation we have here, i.e., termination of employment by UGT without cause, as distinguished from voluntary employee termination or termination for cause, as follows:

<u>7.</u>     **Termination.**

(a)     **For Cause.**     The Company may terminate this Agreement immediately for cause upon written notice to the Employee, in which event the Company shall be obligated to pay the Employee that portion of the minimum base annual salary due him through the date of termination. Cause shall be limited to (I) The failure to perform duties consistent with a commercially reasonable standard of care; (ii) the willful neglect of duties; (iii) criminal or other illegal activities; or, (iv) a material breach of this Agreement.

(b)     **Without Cause.**     Either party may terminate this Agreement immediately without cause by giving written notice to the other. If the Company terminates under Section 7(b), then it shall continue to pay the Employee an annual amount equal to the product of the Employee's minimum annual base salary in effect as of the date of the termination, plus the bonuses paid or to be paid for all years during the term of this agreement. The Company shall make such payment in a lump sum on or before the fifth day following

4

the date of termination, or as otherwise directed by the Employee. In addition, the Company shall maintain in full force and effect for the continued benefit of the Employee for the number of years (including partial years) remaining in the Term, all employee benefit plans and programs in which the Employee was entitled to participate immediately prior to the date of termination, provided that the Employee's continued participation is possible under the general terms and provisions of such plans and programs. In the event that the Employee's participation in any such plan or program is prohibited, the Company shall, at its expense, arrange to provide the Employee with benefits substantially similar to those which the Employee would otherwise have been entitled to receive under such plans and programs from which his continued participation is prohibited. If the Employee terminates under Section 7(b), then the Company shall be obligated to pay the Employee the minimum annual base salary due him through the date of termination.

(c) **Disability.**   If the employee fails to perform his duties hereunder on account of illness or other incapacity for a period of nine consecutive months then the Company shall have the right upon written notice to the Employee to terminate this Agreement without further obligation by paying the minimum base annual salary, without offset, for the remainder of the Term in a lump sum or as otherwise directed by the Employee.

(d) **Death.**   If the Employee dies during the Term, then this Agreement shall terminate immediately and the Employee's legal representative shall be entitled to receive the minimum annual base salary for the remainder of the Term in a lump sum or as otherwise directed by the Employee's legal representative.

(e) The Employee shall not be required to mitigate the amount of any payment provided for in this Section 7 by seeking other employment or otherwise, nor shall any compensation or other payments received by the Employee after the date of termination reduce any payments due under this Section 7.

5

> (f) **Effect of Termination.**   Termination for any reason or
> for no reason shall not constitute a waiver of the Company's
> rights under this Agreement nor a release of the Employee
> from any obligation hereunder except his obligation to
> perform his day-to-day duties as an employee.

The intent of Paragraph 7 (b) is obvious.   In consideration of John Shafer
accepting employment, UGT assured him that if it terminated him  without cause, it
would continue all compensation and benefits of employment through the term of the
agreement, in this case November 23, 2008. Compensation includes salary and "the
bonuses paid or to be paid for all years during the term of this agreement," not just
through the date of termination or prorated through that date. The reason for this is
apparent; UGT  secured John Shafer's best efforts and loyalty for three years by
guaranteeing him continued compensation even if UGT decided to terminate him without
cause before the term date in the contract.

The termination provision of Paragraph 7 (b) makes a critical distinction between
employees terminated without cause and employees who voluntarily terminate their
employment.  In the former situation, UGT obligated itself:

> [to] continue to pay the Employee an ***annual amount equal to
> the product of the Employee's minimum annual base salary
> in effect as of the date of termination, plus the bonuses paid
> or to be paid for all years during the term of this agreement.***
> (Emphasis added.)

In the latter situation UGT obligated itself only "***to pay the employee the minimum base
salary due him through the date of termination.***" This distinction further evidences the

intent of the agreement to guarantee John Shafer, through the term of the contract, annual income equal to his minimum salary and bonus compensation and all other benefits providing he exerted his best efforts and loyalty to UGT and was not terminated for cause.

Paragraph ten includes a one (1) year national non compete clause. Again, however, there is an exception for John Shafer's benefit in the event UGT terminates him without cause or if UGT is unwilling to extend the term of the agreement.

Paragraph fifteen provides that the law of the State of New Jersey "shall govern the construction and enforcement of this Agreement . . . " It also includes a forum selection clause designating New Jersey as the forum state in the event of litigation.

Paragraph sixteen provides for an award of attorneys' fees and costs to the prevailing party in the event of litigation.

### CHRONOLOGY OF SIGNIFICANT EVENTS

UGT hired John Shafer as of May 28, 2004, pursuant to a verbal agreement negotiated with John Dwyer, UGT's majority shareholder if not sole stockholder. The oral agreement, evidenced and confirmed by emails which are part of plaintiff's personnel file, provided that the plaintiff would receive an annual salary of $170,000 and a bonus of three (3) to five (5) percent of agency profits, to bring his total annual compensation package between $350,000 and $500,000. (Schablik Certification, **Exhibit "A"**, at pp 25 - 27.) UGT also provided the plaintiff with standard company benefits, including health,

dental, disability and life insurance and an automobile allowance.

The plaintiff and Dwyer negotiated a total annual compensation package consisting of salary and bonus.   This negotiated annual compensation package is evidenced and confirmed by emails which are part of plaintiff's personnel file. Id. An annual compensation package consisting of minimum base salary and a bonus was and is the standard practice in the industry. (Shafer Certification, at ¶ 8.)  Thus, the focus was on total annual compensation with a methodology for getting there. (Id.)

UGT paid the plaintiff an annual salary at the rate of $170,000 from May 28 through December 31, 2004.  It also awarded the plaintiff a bonus of $150,000, which was paid on February 28, 2005.  The practice of awarding an employee a bonus for the calender year and paying it to him during the subsequent calender year, also was and is an industry standard. John Shafer's annualized 2004 earnings were thus $427,142[1], well within the annual compensation package negotiated with John Dwyer.

First American Title Insurance Company (hereafter "1st Am Title") acquired UGT in February of 2005.  1st Am Title was and is a wholly owned subsidiary of First American Corporation. Immediately following 1st Am Title's acquisition of UGT, a new management team was instituted.

Sometime during the summer of 2005, plaintiff began reporting to Joseph Drum, UGT's chief operating officer and a 1st Am Title employee.  In November of 2005, Drum

---

[1]Annualized compensation includes salary at $170,000 plus 12 months' bonus at an average of $21,428.57 per month ($150,000 bonus paid for 7months = $21,428.57 per month.

presented plaintiff with a written employment agreement.  Drum had secured the form of agreement from another employee file and had merely changed some of the language to be specific to John Shafer (Deposition of Joe Drum attached to Schablik Certification as **"Exhibit D"**, at 11.19 to 12 .20.)

Drum presented the written agreement to Shafer with the representation that it solely was to protect him and provide him with a guaranteed term of employment. (Schablik Certification, **"Exhibit D"**, at pp. 8.10 to .20; 10.23 to 11.18, 13.7 to .12; Shafer Certification, at ¶¶ 15-16.)   In Drum's words, "[The written employment agreement he presented to Shafer] would- the only thing that was changing, essentially, in my mind, was the term. I was giving him a three-year term of employment." (Schablik Certification, **"Exhibit D"**, at 13.25 to 14.14.)  Drum, besides being the chief operating officer of UGT, was also a licensed attorney.  (Id. at 39.14 to 41.19.) Drum never told Shafer that UGT intended the written agreement to alter the terms of the verbal compensation agreement that Shafer enjoyed until then with UGT and Dwyer. ( Shafer Certification, at ¶¶ 16-19.)  Significantly, at the time 1st Am Title acquired UGT, it came into possession of John Shafer's personnel file. (Schablik Certification, **Exhibit "A"**, at pp. 7 - 60.) Within that file were copies of documents  confirming the terms of John Shafer's employment with UGT. (Id. at pp. 25-27.) Thus, UGT was on notice of the compensation agreement John Shafer negotiated with John Dwyer in 2004 when it proposed the written employment agreement.

The plaintiff reviewed the contract, assumed that the terms of compensation would continue, i.e., a minimum salary of $176,800 (which was his salary at the time he signed the employment agreement) and a bonus of three 3% to 5% of agency profit, for a total annual compensation of $350,000 to $500,000. The plaintiff also read the one (1) year covenant not to compete and realized that if he terminated his employment voluntarily, he would effectively consign himself to unemployment for one (1) year without any prospect of income. Nevertheless, having been told by Joe Drum that the contract was only intended to protect him by providing a guaranteed three-year term of employment and having no reason to believe he would voluntarily terminate his employment with UGT, John Shafer signed the agreement in the form in which it was presented without any negotiation. (Shafer Certification, at ¶¶ 14-21.)

The contract called for a minimum annual base salary of $175,000, but Shafer's actual salary at the time he signed the contract was $176,800. (Shafer Certification, at ¶ 23.) UGT awarded Shafer a bonus of $150,000 for 2005, which actually equated to 6% of agency profit. According to industry standards, UGT paid this sum to the plaintiff in 2006. This brought the plaintiff's total annual compensation package for 2005 to $326,800. Although UGT compensated John Shafer at a lesser rate than in 2004, the 6% of agency profit was higher than the originally agreed on range of 3% to 5% of agency profit and his annual compensation approached the originally agreed on total compensation floor of $350,000. For these and the further reasons that he was dealing

10

with a new and unknown management, John Shafer did not voice his displeasure with his 2005 bonus or total annual compensation. (Shafer Certification, at ¶¶ 24-25.)

UGT paid the plaintiff his minimum base salary of $176,800 through 2006. In addition, it awarded him a bonus of $75,000 which amounted to 2% of agency profits. Inexplicably, while UGT paid all other bonuses in March 2007 it did not pay Shafer's 2006 bonus until May 2007. This 2006 bonus payment of $75,000 came to the plaintiff as a shock because it was based on 2% of agency profits and not the 3% to 5% he had agreed to, and because his salary and bonus for 2007 aggregated only $251,800, which was significantly less than the $350,000 to $500,000 to which he and UGT agreed in 2004. Moreover, the plaintiff had accrued $150,000 during the course of the year to be applied toward his 2006 bonus - 100% greater than his actual bonus! (Shafer Certification at ¶¶ 27-28 .)

There followed a meeting in May 2007 between John Shafer and Joe Drum, at which time the plaintiff expressed his surprise and displeasure with his 2006 bonus of $75,000 and his total annual compensation. In this conversation, Shafer requested his bonus be increased to 4% of agency profits, which he felt to be a fair compromise between the 3% to 5% as agreed to by the plaintiff, UGT and John Dwyer. Drum's response was to assure the plaintiff that he was "in a good position" and to "stay put on this for a while." (Shafer Certification, ¶¶ 29-31.)

John Shafer faced a Hobson's choice, i.e., terminate voluntarily and remain

11

unemployed and without income for one year pursuant to the non compete agreement or accept his situation and the assurances made to him by Drum that he was "in a good position" and to "stay put on this for a while." (Shafer Certification, at ¶¶ 31-32.) Faced with the economic duress created by the non compete provision, John Shafer had no meaningful choice and accepted the latter alternative.

Nevertheless, Shafer was becoming increasingly frustrated trying to "stay put on [his 2006 compensation] for a while." Thus, on July 17th he emailed UGT's CFO and asked whether there was anything left over from the $150,000 he had accrued for his bonus in 2006. (Schablik Certification, **Exhibit "A"**, at p. 106.)  This, too, failed to provoke any meaningful response. (Shafer Certification, at ¶ 34.)

Frustrated with the incomplete discussion with Drum concerning his 2006 bonus and not having received any meaningful response to his July 17th email to UGT's CFO, on November 8, 2007, the plaintiff emailed Joe Drum directly and attached a spreadsheet of his anticipated 2007 bonus calculated at a range of 2% to 5% of net income before taxes for the areas under his control.  He also stated that he wanted to make up for the paltry bonus awarded him in 2006.   (Schablik Certification, **Exhibit "A"** , at pp. 93-94.) Meanwhile, however, UGT  decided to eliminate the plaintiff's position and terminate him without cause.

Gary Kermott, UGT's Chief Operating Officer, attempted several times to meet with the plaintiff personally to tell him of his fate. When this meeting became difficult or

12

impossible to schedule because of Kermott's scheduling difficulties, Kermott told Shafer in a telephone call conversation on December 14, 2007, that UGT would require his services no longer. (Deposition of Gary Kermott annexed to certification of Noel E. Schablik as **Exhibit "E"**, at pp. 21.6 to 23.15.) The Dec. 14, 2007 telephone conversation was cordial. Kermott told Shafer that UGT would pay him what it owed him under the contract of employment and wished him well. (Schablik Certification, **"Exhibit E"**, at pp. 23.16 to 24.12.)

Meanwhile, Kermott had instructed Joe Drum to calculate what UGT owed Shafer under the contract. (Schablik Certification, **"Exhibit D"** at pp. 42.24 to 43.8; Kermott Dep at p. 24.13 to .24.) Until then, Kermott was not familiar with the contract. (Schablik Certification, **"Exhibit E"** at pp. 23.16 to 24.12; Schablik Certification, **"Exhibit B"**, at pp. 11.17 to 12.6.) However, this was much like "the blind leading the blind," since Drum also was unfamiliar with the contract and what termination benefits Shafer was entitled to. In fact, Drum did not calculate what UGT owed Shafer under the contract, but merely had Gallaher calculate Shafer's bonus at 2% of pre-tax profit for the region. (Schablik Certification, **"Exhibit D"** at pp. 42.24 to 43.12.)

Drum conscripted UGT's Chief Financial Officer, Mike Gallaher to help him compute Shafer's 2007 bonus. Gallaher's initial calculation, as of the close of business on Oct. 31, 2007 and projecting November and December revenues, was that Shafer's bonus would be $162,640. (Schablik Certification, **"Exhibit D"**, at pp.19.7 to 21.18.) This

13

number was not accurate, however, since Drum had instructed Gallaher to omit the results of certain areas within the plaintiff's responsibility. In particular, Drum instructed Gallaher not to include agency operations known as Talon PA and Talon NY. (Id. at 24.9 to 26.22.)  If the results of operations for Talon PA and Talon NY were included and recalculated on the same basis as Gallaher's original formula, Shafer's bonus would have been $27,810 greater than Gallaher's original calculation. (Shafer Certification at ¶ 44.)

Drum apparently rounded the calculation and reported to Kermott that  Shafer's 2007 bonus should be $165,000. (Schablik Certification, **"Exhibit D"**, at pp. 47.17 to 48.4.)  Kermott, in turn, offered this sum to Shafer as his 2007 bonus. (Id. at p. 46.17 to .25.)  Shafer's calculation of his 2007 bonus, however, resulted in a range of $218,093 to $545,232, based on 2% to 5% of agency profits. (Shafer Certification, at ¶ 38.)  Also, by this time Shafer had read his employment contract and realized he was entitled to much more in termination benefits than his 2007 bonus and salary from January 1, through Nov. 23, 2008, which Kermott had offered him. (Shafer Certification, at ¶ 46.)

Kermott took umbrage when Shafer raised these additional termination benefits during their negotiations. Kermott, despite the fact he had not yet read the contract, felt he and Shafer had negotiated a global termination agreement and Shafer was doing a "bait and switch" by asking for additional termination benefits after they had negotiated  and agreed to the 2007 bonus amount of $165,000. (Schablik Certification, **"Exhibit E"**, at p. 44.9 to .17.) He told Shafer that in view of Shafer's demands for additional termination

14

benefits under the contract, he was going to play hardball and recalculate Shafer's bonus downward. (Id.; Shafer Certification at ¶ 46.) Kermott then had Drum supervise Gallaher's recalculation of Shafer's 2007 bonus by adding into the equation losses from start-up agency operations that had never been part of the parties' agreement or original calculation.    Drum also directed Gallaher to remove profitable results from certain operations that were within Shafer's responsibility, including Talon PA and Talon NY, which should have been part of the net profit before taxes calculation on which his bonus was predicated. (Schablik Certification, **"Exhibit D"**, at pp. 33.21 to 34.19; Shafer Certification, at ¶¶ 39-48.)

Things culminated on January 4 and 7, 2008. On January 4th, Shafer, Kermott and 1st Am Title's in-house counsel, Wendy Kushner, participated in a telephone conference. In Shafer's mind, the parties had negotiated and agreed on a lump sum payment for salary through Nov. 23, 2008; his 2007 bonus of $165,000; his automobile allowance of $1,000 per month; and reimbursement for COBRA payments  through the term date of the contract.  This is confirmed by email correspondence from Shafer to Kushner dated Jan. 6, 2008. (Schablik Certification, **"Exhibit A"**, at p. 61.)  At this point, the only remaining item to be negotiated was Shafer's claim for a bonus for 2008. Thus, Kermott told Shafer in the January 4, 2008 teleconference that he wanted a "final number" to conclude the matter. Shafer responded that he needed to consult with his lawyer (with whom he had not yet consulted), and would try to get back to Kermott during the following week.

Kermott's deposition testimony and Kushner's notes of the conversation confirm this description of the conversation. (Kermott Dep at 51.21 to 52.1; Schablik Certification, **"Exhibit G".**)   On Jan. 7, 2008, defendants withdrew their offer. At this point all negotiations broke down.

The plaintiff believes it to be of immense importance to emphasize that no one at UGT ever calculated the value/cost of continuing plaintiff's benefits of employment as per ¶¶ 4, 4(a), 4(b), 4(d) and 5 of the employment contract. (Schablik Certification, **"Exhibit E"**, at pp. 52.24 to 53.3; <u>Id.</u>, **"Exhibit D"** at 51.10 to .16; <u>Id.</u>, **"Exhibit C"** at 30.3 to .7 and 37.16 to .20.) Nevertheless, UGT now contends it intended its payment of $165,000 to include a bonus payment of $143,528 plus the cost/value of post employment benefits to which plaintiff was entitled pursuant to the employment agreement.

Clearly, if UGT felt the plaintiff was only entitled to a 2007 bonus payment of $143,528, it could and would have performed a mathematical calculation of the exact cost of post termination benefits and added that specific number to the bonus amount.  Never, however, did anyone attempt this calculation and, because of this, there was no way UGT determined whether $165,000 was greater or less than the bonus and post termination benefits to which it felt plaintiff was entitled. To the contrary, UGT calculated plaintiff's 2007 bonus to be $165,000. Then, when plaintiff raised legitimate contract issues relating to post termination benefits, UGT and Kermott artificially and in bad faith reduced plaintiff's bonus calculation and told him the preposterous story that it intended the

16

$165,000 to include the reduced bonus of $143,528 and the value of his post termination benefits.

## LEGAL ARGUMENT

I.    **DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS MOTION AND PLAINTIFF IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON ITS CROSS-MOTION.**

Defendants are not entitled to summary judgment for reasons argued below.  There is a more than sufficient evidentiary basis on which a jury could find for the plaintiff. Material facts having the ability to affect the outcome of the suit under New Jersey law are in dispute.  Defendants have failed to shoulder the burden of showing no genuine issue of material fact to be in existence.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The plaintiff, however, is entitled to summary judgment. The plaintiff seeks construction of the contract between the parties.  As such, "a ruling interpreting the terms of a contract, or whether it binds a given party, forms an appropriate ground for summary judgment on claims arising out of that contract." Quinta v. Accenture, LLP, Slip Op. at p.5, 2008 WL 485, 2934 (D.N.J. 2008), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986).

## II.   NEW JERSEY LAW APPLIES TO THE CONSTRUCTION AND ENFORCEMENT OF THE WRITTEN EMPLOYMENT AGREEMENT.

The written Employment Agreement is dated November 22, 2005 and was signed by United General Title Insurance Company and John Shafer.  *See* Shafer Certification, **"Exhibit B"**.  Paragraph 15, entitled "**Governing Law**," provides:

> New Jersey law shall govern the construction and enforcement of this Agreement and the parties agree that any litigation pertaining to this Agreement shall be adjudicated in the courts of New Jersey.

Accordingly, the law of the State of New Jersey governs the construction and interpretation of the contract between the parties.  Cf. Copelco Capital, Inc. v. Shapiro, 331 N.J. Super. 1, 5 (App. Div. 2000).

## III.   THE BONUS SUB-PART OF THE CONTRACT'S SALARY DEFINITION IS AMBIGUOUS.

The law of the State of New Jersey with respect to contract construction and interpretation of ambiguous provisions is settled,

> * * [a] evidence of the circumstances is always an aid of the interpretation of an integrated agreement.  This is so even when the contract on its face is free from ambiguity.  The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were striving to attain are necessarily to be regarded.  The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance.  Such evidence is admissible only for the purpose of interpreting the writing - not for the purpose of modifying or enlarging or curtailing its terms, but

18

> to aid in determining the meaning of what has been said.  So
> far as the evidence tends to show, that the meaning of the
> writing, but an intention wholly unexpressed in the writing, it
> is irrelevant.  The judicial interpreter function is to consider
> what was written in the context of the circumstances under
> which it was written, and accord to the language a rational
> meaning in keeping with the expressed general purpose.

Conway v. 287 Corporate Center Associates, 187 N.J. 259 at 269 (2006), quoting from

Atlantic Northern Airlines v. Schwimmer, 12 N.J. 293 at 302 (1953).  The parol evidence

rule is a rule of substantive law, not a rule of evidence and applies to documentary as well

as oral evidence. Id., at 268.  Where, as here, an ambiguity could have been avoided by

simple language, the contract must be construed against the drafter.  Sons of Thunder,

Inc. v. Borden, Inc., 148 N.J. 396 at 420 (1997); In re: Miller, 90 N.J. 210, 221 (1982).

In Conway v. 287 Corporate Center Associates, supra, the New Jersey Supreme

Court adopted the more extensive view of the parol evidence rule advanced by Professor

Corbin and adopted in the Restatement (Second) of Contracts, that " '[a] antecedent and

surrounding factors that throw light upon * * * [the meaning of the contract] may be

proved by any kind of relevant evidence.'" Conway, supra at 268-169.  Thus, regardless

of whether the language of the contract is clear or unclear, New Jersey law

> * * [allows] a thorough examination of extrinsic evidence in
> the interpretation of contracts.  Such contracts may "in clear
> consideration of the particular contract rule provision, an
> overview of all the terms, the circumstances leading up to the
> formation of the contract, custom, usage, and the
> interpretation placed on the disputed provision by the parties'
> conduct." Kearny PBA and Local #21 v. Town of Kearny, 81
> N.J. 208, 221, 405 A.2d., 393 (1979).  "Semantics cannot be

19

> allowed to twist and distort [the words'] obvious meaning in
> the minds of the parties.   Schwimmer, supra, 12 N.J. at 307,
> 96 A.2d. 652.   Consequently the words of the contract alone
> will not always control."

Conway, supra at 269 - 270.

The employment contract in this case, at paragraph 3, provides for an annual salary consisting of a base salary and, "(a) Bonus to be Determined."   This paragraph makes indisputably clear that a bonus was to be paid the plaintiff as part of his annual salary. This also is consistent with the plaintiff's aggregate compensation, consisting of a guaranteed salary and a bonus based on 3% to 5% of agency profits.   However, the paragraph is unclear, and thus ambiguous, as to how the bonus was to be computed and in what amount.   Thus, this particular provision must be interpreted and parol evidence is admissible in aid of that function.

**IV.   PARAGRAPH 3 OF THE EMPLOYMENT AGREEMENT MUST BE INTERPRETED TO PROVIDE THAT THE BONUS COMPONENT OF PLAINTIFF'S ANNUAL SALARY WAS TO RANGE BETWEEN THREE AND FIVE PERCENT OF AGENCY PROFIT SO AS TO PROVIDE HIM WITH TOTAL ANNUAL COMPENSATION OF $350,000 TO $500,000.**

As noted above, this court must conduct "a thorough examination of extrinsic evidence in the interpretation of [plaintiff's Employment Contract].   "Such evidence may

> Include consideration of the particular contractual provision,
> an overview of the terms, the circumstances leading up to the
> formation of the contract, custom, usage, and the
> interpretation placed on the disputed provision by the parties'
> conduct."

Conway, supra, 187 N.J. at 269.   To the extent there is any ambiguity, the contract must

be construed against the drafter.  *See* Point II, supra.  Moreover, any construction or interpretation that would permit defendants to unilaterally manipulate plaintiff's compensation scheme without limitation, thus rendering the contract illusory, is to be avoided.  Nolan v. Control Data Corporation, 243 N.J. Super. 420, 431 (App. Div. 1990).

Analysis of the relevant considerations for interpretation of the plaintiff's employment contract compellingly leads to the conclusion that plaintiff was entitled to a bonus of 3% to 5% of agency profits, so as to provide a total annual salary of $350,000 to $500,000, through the term of the contract.

### A.    **Overview of terms of the contract.**

The bonus provision is found within a separately numbered paragraph of the employment contract, bearing the heading **Salary**.  There is no separately numbered heading **Bonus**.  Rather, the words "Bonus to be Determined" are within a subsection of paragraph 3, under the heading **Salary**.

The placement of the bonus provision within that part of the contract devoted to the definition of the plaintiff's salary, undeniably leads to the conclusion that plaintiff's bonus was to be part of his overall salary.  In other words, plaintiff was entitled to an annual salary consisting of two components, his minimum guaranteed salary and his bonus.

### B.    **The circumstances leading up to the formation of the contract.**

Defendants candidly admit, through Joe Drum, the only person who prepared and

presented the written contract to John Shafer, that the only purpose of the contract was to guarantee Shafer a three year term. The record is devoid of any suggestion that the contract was intended to modify plaintiff's existing salary/bonus arrangement. Thus, the terms of plaintiff's annual compensation agreement as of the moment of execution of the contract sheds light on the parties' intentions with respect to the language within the salary definition of the contract, including its inclusion of a mandatory obligation to pay a bonus.

In this case, no one disputes that the plaintiff and John Dwyer negotiated an oral salary agreement in 2004. At the time, Dwyer was the majority shareholder, if not the sole shareholder of UGT, and was acting on its behalf. The terms of the annual salary structure were a guaranteed salary ($175,000 at that time) and a bonus, consisting of 3% to 5% of agency profits, sufficient to bring plaintiff's annual income within a range of $350,000 to $500,000.

Correspondence to this effect has been produced as part of plaintiff's personnel file. Thus, UGT's own records confirm the oral agreement reached between plaintiff and John Dwyer on behalf of UGT.

Since defendants have acknowledged that the written agreement was <u>for plaintiff's benefit and solely for the purpose of providing him with a guaranteed three year term</u>, the corollary conclusion is that no negative change in the bonus component of plaintiff's annual compensation package was intended. Accordingly, the bonus language in the

22

written agreement should be interpreted to provide an annual bonus, as part of annual salary compensation, ranging from 3% to 5% of agency profit sufficient to bring plaintiff's annual income within the range of $350,000 to $500,000.

    **C.**    **Interpretation placed on the disputed provision by the parties' conduct.**

It is undisputed that in 2004 John Shafer was paid at a rate consistent with his agreement with UGT that his guaranteed salary and bonus would, on an annualized basis, fall within $350,000 to $500,000. Despite the fact that defendants, through Joe Drum, contend in this litigation that Drum announced in 2005 a policy that plaintiff would be paid a bonus at the rate of 2%, in 2005 UGT paid plaintiff a bonus at the rate of 6%. This clearly is inconsistent with an alleged policy to pay a bonus based on 2% of agency profits.

The following year, in 2006, plaintiff was paid a bonus of $75,000 at the rate of 2% of agency profits. This sum, when combined with plaintiff's annual salary of $176,800, fell well below the guaranteed floor of $350,000.

When plaintiff received his 2006 bonus, he immediately confronted his superior, Joe Drum. Drum, rather than unequivocally responding that the agreement was 2% of agency profit, responded equivocally by assuring the plaintiff that he was in a good position and to hold his thoughts for awhile. Drum, the supposed author of the "2% rule", by his conduct confirmed that the plaintiff had never been told of the "2% rule" and that the plaintiff was justified in continuing the indulgence that he would receive a bonus of

3% to 5% of agency profit, with an annual compensation floor of $350,000.

Drum's lack of candor in stating that he imposed a 2% rule as of 2005, is further confirmed by the fact that no one in a position to know of this rule was aware of it. Thus, neither Anne Kulinski, defendant's H-R manager, Michael Gallaher, defendant's chief financial officer, nor Gary Kermott, defendant's COO, was aware of the "2% rule" Drum alleges he imposed as of 2005. Lack of knowledge of the "2% rule" by Kulinski, Gallaher and Kermott, is logically inconsistent with imposition of a policy dramatically affecting compensation, since one would expect at least one and perhaps all of the aforementioned parties to be informed of this dramatic managerial change. Thus, the parties' conduct evidences an interpretation of the bonus provision to provide for a 2006 bonus based on some formula other than 2% of agency profit. That other formula is the pre-existing oral agreement to supplement plaintiff's guaranteed salary by 3% to 5% of agency profit, for a total annual compensation of $350,000 to $500,000.

Moreover, when John Shafer received his 2006 bonus in the amount of $75,000, he immediately voiced his dissatisfaction to Joe Drum, both verbally and in writing. Faced with the written questions about the integrity of the method of computing the plaintiff's bonus, one would expect Joe Drum, as an attorney UGT's COO, to respond emphatically in writing that the deal was 2%. Nevertheless, this normally anticipated response did not occur and suggests the "2% rule" never was implemented.

### D.    Custom and usage.

In computing plaintiff's 2007 bonus, the defendants, in addition to breaching the contract by failing to include the results of Talon PA and Talon NY, included the negative results of start-up operations. A start-up operation reasonably cannot be expected to show a profit during its start-up phase. Indeed, it would be illusory to suggest that negative results of start-up operations are to be part of the base for calculating plaintiff's bonus. Depending on the defendants' assignments to plaintiff, calculation of the negative results of start-up operations literally gave the defendants the right to manipulate plaintiff's bonus scheme without limitation in contravention of New Jersey law. *See* Charles W. Mellon v. Control Data Corporation, 243 N.J. super 420 (App. Div. 1990), wherein the Appellate Division observed:

> Read literally, these [bonus] provisions supplied CDC with the unilateral right to manipulate Nolan's compensation scheme without limitation. Literal interpretation of these clauses would go far towards making these contracts illusory, a result which courts seek to avoid. [Citing and quoting extensively from Russell v. Princeton Laboratories, Inc., 50 N.J. 30 (1967) and Feldman v. U.S. Sprint Communications Co., 714 et. seq. 727 (D.N.J. 1989).

Industry custom and usage also are offended by defendants' conduct. Negative results of start-up operations, as a matter of industry custom and usage, are not calculated into the base for purposes of computing bonus calculation. The reasons for this custom and usage are apparent: start-up operations, as opposed to existing operations, are anticipated to suffer losses during the start-up phase. It would be unfair to arbitrarily suppress the bonus component of a manager's salary simply based on the arbitrary or

whimsical assignment to a particular manager of a disproportionate number of start-ups.

### E.   Rules of Construction.

The employment contract was drafted and presented to the plaintiff by Joe Drum, UGT's COO and a licensed attorney.  The contract was based on a form regularly used by UGT and with which it presumably was intimately familiar.  This case cries out for imposition of the familiar rule that a contract be construed against the draftsman.  Thus, to the extent there is doubt as to the interpretation of the bonus clause, that clause must be construed against defendants and in favor of John Shafer.

### F.   Admissions of the Parties.

The form of contract in issue in this case has been admitted by defendants' general counsel as being overly weighted in favor of the employee.  Defendants' H-R manager, Anne Kulinski, criticized it as being poorly drafted.   Ms. Kulinski was joined by defendants' highest ranking officers, Mike Gallaher, Joe Drum and Gary Kermott, in the conclusion that the bonus provision is so ambiguous that neither could find the bonus definition within the contract.

Surely, if Kulinski, Gallaher, Drum and Kermott could not find the bonus formula within the written contract, the conclusion is inescapable that in order to define the bonus formula, the Court must engage in the process of construing the contract and interpreting the bonus clause.

Defendants argue that plaintiff's deposition testimony indicates he admitted there

was absolute discretion in the defendants as to whether or not they would pay him a bonus and, if so, in what amount. Not only is this argument legally flawed for the legal reasons argued above, but it is unsupported by the plaintiff's deposition testimony. Defendants cleverly fail to tell the court that this select extraction from plaintiff's deposition transcript was made in a larger context, wherein the plaintiff explained that because he was bound by the one year non-compete clause in the employment contract, he was under economic duress and effectively had no choice other than to accept what defendants gave him. The alternative was to quit and remain unemployed and without income for at least one year, which was unacceptable. (*See* Schablik Certification, "**Exhibit F**", at pp. 44.11 to .25; 58.23 to 61.14.)

Defendants' attempted manipulative use of limited passages from plaintiff's deposition transcript cannot support the proffered conclusion that defendants had absolute discretion whether or not to pay him a bonus and, if so, in what amount. *See* Bryson v. Brand Industries, Inc., 621 F.2d 556 (CA3rd 1980), holding that an employee's acknowledgment in a deposition that his employer had the unfettered power whether or not to award a bonus, is not a binding admission if a fair reading of the plaintiff's deposition testimony shows the plaintiff believed there was "a real obligation" to pay a bonus, but its payment and amount depended on conditions outside of his control. This is precisely what occurred here. The plaintiff was in a position of economic duress because of the effect of the one year covenant not to compete. In the

plaintiff's mind, even if defendants decided not to pay him a bonus he did not have the option to leave voluntarily since he would be precluded from working in the title industry (the only industry in which he had worked for approximately forty (40) years) and would lose a year of income.  Thus, in plaintiff's mind, the defendants could do whatever they wanted and he was without meaningful options.

Clearly, the plaintiff's deposition testimony does not support the conclusion that defendants were legally permitted to exercise unfettered discretion as to whether to pay a bonus.  To the extent any ambiguity exists, "all inferences favorable to the plaintiff must be drawn." Id. at 560.  *See* also, Nolan v. Control Data Corporation, supra, 243 N.J. Super. At 431, holding that to construe a contract of employment to permit the unilateral manipulation of an employee's compensation would render the contract illusory, and should be avoided.

Moreover, defendants should not be permitted to benefit from having wittingly or unwittingly placed the plaintiff in a position of economic duress. While defendants admit the written contract of employment was solely intended for plaintiff's benefit and so represented to him before he signed it, the fact of the matter is that the one year non compete clause, without a specific definition of the bonus formula, placed the plaintiff in a position of economic duress. See Justice Garibaldi's opinion for a unanimous court in Continental Bank of Pennsylvania v. Barclay Riding Academy, Inc., 93 N.J. 153 at 177 (1983), wherein the concept of economic duress was defined as follows:

28

We adhere today to our previous statement of the law of duress in *West Park Ave*.-that the "decisive factor" is the wrongfulness of the pressure exerted. ***The term "wrongful" in this context encompasses more than criminal or tortious acts, Miller v. Eisele, 111 N.J.L. 268, 276 168 A. 426 (E & A 1933), for conduct may be legal but still oppressive. As the Appellate Division rightly observed in Wolf v. Marlton Corp., 57 N.J.Super. 278, 287, 154 A2d. 625 (1959), "[w]e have come to deal, in terms of the business compulsion doctrine, with acts and threats that are wrongful, not necessarily in a legal, but in a moral or equitable sense." (Emphasis added.)***

Defendants, charged with knowledge of the contract they drafted, were fully aware of the effect of the non competition clause on the plaintiff's ability to protest the formula by which his bonus was calculated. Having represented to the plaintiff that the contract was solely for his benefit by providing a three year term, it would be morally and equitably wrong to permit them to benefit from the one year non competition clause and its adverse impact on plaintiff's ability to protest the method by which his bonus was calculated.

## V.    PLAINTIFF IS ENTITLED TO PARTIAL SUMMARY JUDGMENT

### a.    Defendants breached the bonus provision of the employment contract with respect to plaintiff's 2006 annual compensation.

Assuming the court concludes the bonus provision of paragraph 3 of the contract to be ambiguous and interprets it to provide plaintiff with a bonus of 3% to 5% of agency profits, which, with a guaranteed salary of $176,800, will bring plaintiff's total salary

compensation to $350,000 to $500,000, it is clear defendants breached their contractual

duty to the plaintiff in 2006.  Plaintiff's salary for 2006 was $176,800.  He was paid a 2%

bonus of $75,000, for a total compensation of $251,800 - $98,200 below the minimum

floor of $350,000.  Thus, in 2006 plaintiff suffered minimal damages of $98,200.

     **b.**    **Defendants breached the bonus provision of the employment contract with respect to plaintiff's 2007 bonus.**

In 2007, plaintiff was paid a bonus of $143,528, based on 2% of agency profits.

Even assuming the "2% rule" to apply, plaintiff was denied $27,810 in bonus money for

the profitable Talon PA and Talon NY agencies which were arbitrarily excluded from the

bonus calculations.

The plaintiff also lost $16,531 based on defendants' wrongful inclusion in his

bonus base of the negative start-up operations.  Inclusion of negative start-up results was

contrary to industry practice, as evidenced by defendants' initial 2007 bonus calculation

of $165,000 that did not include negative start-ups. It was not until the plaintiff insisted

on being compensated for his other contract termination benefits that Drum or Kermott

instructed Gallaher to include the negative results of start-up operations. Until then,

negative start-up numbers did not factor into the bonus equation.

Again, accepting defendants' numbers and the "2% rule" for purposes of argument

only, defendants' breach of the agreement between the parties resulted in damages to the

plaintiff of $44,341 in 2007.  This number consists of bonus money of $27,810 which was

earned on the results of Talon Pa and Talon NY, but not included, plus the $16,531

wrongfully deducted for negative results of start-up operations. The damages product only escalates exponentially as the 2% bonus formula is corrected to 3% to 5%.

Moreover, plaintiff's 2007 compensation aggregated only $320,328, which is $29,672 below his guaranteed floor of $350,000. Thus, defendants' breach of the agreement in 2007 minimally caused plaintiff damages of $44,341 under plaintiff's "2% rule", and $29,672 when compared with the guaranteed income floor of $350,000.

> **c.** **Defendants breached the post-termination benefits provision of the contract.**

The plaintiff has been denied valuable termination benefits to which he is entitled. Defendants contend they paid plaintiff a total of $165,000, consisting of a bonus of $143,528 and termination benefits of $21,472. However, at a minimum, plaintiff was entitled to termination benefits of $38,971, consisting of COBRA of $15,504, auto allowance of $11,000 and vacation pay of $12,467. Plaintiff, therefore, suffered additional damages of $17,499, i.e., $38,971 minus $21,472= $17499.

The plaintiff is entitled to partial summary judgment declaring him entitled to reimbursement for COBRA payments in the amount of $15,504, for the period January 1, 2008 through November 23, 2008. The plaintiff's right to reimbursement for COBRA payments which replaced family health insurance coverage enjoyed during his employment, arises from paragraph 7 of the contract, **Termination**. This paragraph provides in subsection (b), that where the employee is terminated without cause:

> * * * If the Company terminates under Section 7(b), then it

31

shall continue to pay the Employee an annual amount equal to the *product of the Employees' minimum annual base salary in effect as of the date of termination, plus the bonuses paid or to be paid for all years during the term of this agreement.* The Company shall make such payment in a lump sum on or before the fifth day following the date of termination, or as otherwise directed by the Employee.  In addition, the *Company shall maintain in full force and effect for the continued benefit of the Employee for the number of years (including partial years) remaining in the Term, all Employee benefit plans and programs in which the Employee was entitled to participate immediately prior to the date of Termination,* provided that the Employee's continued participation is possible under the general terms and provisions of such plans and programs.  In the event that the Employee's participation in any such plan or program is prohibited, the Company shall, at its expense, arrange to provide the Employee with benefits substantially similar to those which the Employee would otherwise have been entitled to receive under such plans and programs from which his continued participation is prohibited. (Emphasis added.)

*(See* Shafer Certification, **"Exhibit B"** at ¶ 7(b).)

The plaintiff enjoyed family health insurance coverage during the period of his employment.  At the time of his termination, the plaintiff converted that coverage pursuant to COBRA, and incurred payments of $848.71 per month during the eleven (11) months from the date of his termination through November 23, 2008.  Since these payments were tax free while employed, the real cost of maintaining those payments must be grossed up for the effects of taxation, for a total cost to the plaintiff of $15,504. (*See* Shafer Certification, **"Exhibit E".**)

The plaintiff also is entitled to reimbursement for the lost benefit of his auto

32

allowance in the amount of $1,000 per month.  At the time of plaintiff's termination, he

enjoyed the benefit of an automobile allowance at the rate of $1,000 per month.  That

payment was made to plaintiff pursuant to paragraph 4 of the Employment Contract,

"**Other Compensation and Fringe Benefits**."  (*See* Shafer Certification, **"Exhibit B"** at

¶ 4.)  Although the particular contract provision provided for reimbursement at the rate of

$750 per month, as of the date of plaintiff's termination on December 31, 2007, he was

receiving a benefit of $1,000 per month.  This sum was paid to him without regard to

actual costs of travel and was a fringe benefit of employment.  The plaintiff has been

denied this $1,000 per month benefit from the date of his termination through November

23, 2008, for a total of $11,000.

Another benefit of employment which the plaintiff enjoyed was compensation for

unused vacation time paid at his salary rate of $176,800 per year.  During the prior year,

the plaintiff was paid for unused vacation time and he is entitled to this continued benefit

from the date of his termination through November 23, 2008, in the sum of $12,467.  (*See*

Shafer Certification at ¶ 53.)

The plaintiff also is entitled to a minimum bonus of $163,073 for the period

January 1, 2008 through November 23, 2008.  Pursuant to ¶ 7(b) of the Employment

Agreement, upon terminating the plaintiff without cause defendants became obligated to

pay him "an annual amount equal to the product of the Employee's minimum annual base

salary in effect as of the date of termination, ***plus the bonuses paid or to be paid for all***

*years during the term of the agreement*." As argued above, the plaintiff's agreement with the defendants provided he would be paid an annual salary consisting of a guaranteed portion and a bonus portion, sufficient to provide him with a total annual compensation range of $350,000 to $500,000. It was important to the plaintiff to negotiate an annual compensation package and the contract is clear that there is one salary to be paid, consisting of a guaranteed minimum portion and a bonus portion which, when added together, produce a range of $350,000 to $500,000. Pursuant to the involuntary termination provisions of the contract, plaintiff is entitled to continuation of his entire salary through November 23, 2008, including the guaranteed portion and the bonus portion, at an annualized rate of not less then $350,000.

The plaintiff was paid $157,760 for the guaranteed portion of his salary for the eleven month period from January 1, 2008 through November 23, 2008. Since the plaintiff was entitled to a minimal salary of $350,000 pr year, his eleven month aggregate compensation should have been $320,833, i.e., $350,000 x 11/12 = $320,833. At a minimum, the plaintiff is entitled to additional salary compensation of $163,073, the difference between what he was paid and what he should have been paid for the period January 1, 2008 through November 23, 2008.

The plaintiff is entitled to partial summary judgment in the aggregate sum of $337,345, consisting of the following:

| | | |
|---|---|---|
| a. | 2006 Bonus | $ 98,200 |
| b. | 2007 Bonus | $ 44,341 |
| c. | 2008 COBRA | $ 15,504 |
| d. | 2008 Auto Allowance | $ 11,000 |
| e. | 2008 Vacation Pay | $ 12,467 |
| f. | Additional 2008 Salary | $163,073 |
| g. | Less termination benefits paid | ($21,472) |
| | **TOTAL:** | **$323,113** |

## CONCLUSION

Defendants' motion for summary judgment must be denied and plaintiffs' cross-motion for partial summary judgment must be granted for the above-stated reasons.

Respectfully submitted,

**SCHABLIK and KNAPP, P.A.**

BY: _____

**NOEL E. SCHABLIK, ESQ.**

May 14, 2009

36