**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN B. SHAFER,<br><br>                Plaintiff,<br><br>v.<br><br>UNITED GENERAL TITLE INSURANCE COMPANY, FIRST AMERICAN CORPORATION, FIRST AMERICAN TITLE INSURANCE COMPANY & GARY KERMOTT,<br><br>                Defendants. | Civ. No. 08-2884 (DRD)<br><br>**O P I N I O N** |

*Appearances by:*

SCHABLIK AND KNAPP, P.A.
by: Noel E. Schablik, Esq.
35 Waterview Boulevard, 1st Floor
Parsippany, NJ 07054

    *Attorneys for Plaintiff*

DAY PITNEY LLP
by: Theresa A. Kelly, Esq.
P.O. Box 1945
Morristown, NJ 07962

    *Attorneys for Defendants*

**DEBEVOISE, Senior District Judge**

Plaintiff, John B. Shafer, brought this action against his former employer, United General Title Insurance Company ("UGT")[1] charging that when UGT terminated his employment it failed to pay him all the benefits to which he was entitled under his employment agreement. The parties have cross-moved for summary judgment. The Court will grant UGT's motion and deny Shafer's motion.

## I. BACKGROUND

Shafer worked at UGT from May 17, 2004 until his termination on December 31, 2007. Until November of 2005, he was an at-will employee. From May 28 to December 31, 2004, Shafer was paid an annual salary at the rate of $170,000, in addition to a bonus of $150,000. This placed his bonus between three and five percent of agency profits, for a total annual compensation between $350,000 and $500,000. In November of 2005, Shafer entered into a written Employment Agreement with UGT (the "Agreement"). The "Salary" provision, which is critical to this case, read as follows:

> 3. **Salary**. During the Term, the Company shall pay the Employee a <u>minimum base annual salary</u>, before deducting all applicable withholdings, of $175,000.00 per year, payable at the times and in the manner dictated by the Company's standard payroll policies. Such minimum base annual salary may be periodically reviewed and increased (but not decreased) at the discretion of the Compensation Committee of the Board of Directors to reflect, among other matters, cost of living increases and performance results.
>
> (a) Bonus To Be Determined

---

[1] Shafer originally filed his complaint in the New Jersey Superior Court against UGT, First American Title Insurance Company (UGT's parent company), First American Corporation (First American Title Insurance Co.'s parent company) and Gary Kermott (Chairmen of the Board and Chief Executive Officer of UGT and senior executive of First American Title Insurance Company). Defendants removed the case to this Court. All claims against these other parties have been dropped. Shafer voluntarily withdrew claims that UGT violated the Employee Retirement Income Security Act ("ERISA"), and that UGT failed to pay Shafer a bonus "in an amount equal to the bonuses paid to executives at a similar level."

Shafer was also entitled to "Other Compensation and Fringe Benefits." The other benefits were offered in addition to any bonus, and included (1) "standard company benefits enjoyed by the Company's other top executives;" (2) "medical and other insurance under the Company's medical plan" for Shafer and his dependants; and (3) a monthly car allowance of $750. The Agreement further provided for four weeks paid vacation each year.

The Agreement also contained a non-compete clause, which prevented Shafer, should he voluntarily leave the company, from working within the same trade for one year following his departure. On the other hand, the Agreement contains a provision for involuntary termination without cause (Section 7(b)), which provides:

> If the Company terminates under Section 7(b), then it shall continue to pay the Employee an annual amount equal to the product of the Employee's minimum annual base salary in effect as of the date of termination, plus the bonuses paid or to be paid for all years during the term of the agreement. The Company shall make such payment in a lump sum on or before the fifth day following the date of termination, or as otherwise directed by the Employee. In addition, the Company shall maintain in full force and effect for the continued benefit of the Employee for the number of years (including partial years) remaining in the Term, all employee benefit plans and programs which the Employee was entitled to participate immediately prior to the date of termination, provided that the Employee's continued participation is possible under the general terms and provisions of such plans and programs. In the event that the Employee's participation in any such plan or program is prohibited, the Company shall, at its expense, arrange to provide the Employee with benefits substantially similar to those which the Employee would otherwise have been entitled to receive under such plans and programs from which his continued participation is prohibited. If the Employee terminates under Section 7(b), then the company shall be obligated to pay the Employee the minimum annual base salary due him through the date of termination.

A section of the Agreement entitled "Amendment" states that it "contains, and its terms constitute, the entire agreement of the parties, and it may be amended only by a written

document signed by both parties to th[e] Agreement." (Id.) Further, this section states that the Agreement "supersedes and replaces any prior agreements or understandings between the parties with respect to the subject matter hereof." (Id.)

For 2005, Shafer received an annual salary of $176,800 and a $150,000 bonus, reflecting six percent of agency profits. For 2006, Shafer was again paid an annual salary of $176,800, but this time his bonus was $75,000, a rate of two percent of agency profits. Shafer's employment was terminated on December 14, 2007. Shortly thereafter he received a separation payment that included (1) his 2008 annual salary in the amount of $157,760 (for the eleven months in 2008 covered under the Agreement); (2) his 2007 bonus in the amount of $143, 528; and (3) $21,472, representing payment for COBRA medical coverage through the duration of the Agreement, and other "benefit" reimbursement under the Agreement, including a $750 car allowance.

Shafer's first amended complaint (the "Complaint") alleges in Count One that UGT breached the Agreement by denying Shafer his bonus for the remainder of the Agreement term (through November 30, 2008). Further, Shafer alleges that UGT failed to compensate him for employee benefit plans, such as Shafer's automobile allowance at $1,000 per month, tax free medical insurance reimbursement, and four weeks vacation pay at $3,400 per week. Count Two of the complaint alleges that Shafer is owed additional compensation for bonuses he received during his time working under the Agreement prior to his termination.

In support of his claims regarding his bonuses, Shafer contends that the provision "Bonus to Be Determined" unambiguously requires UGT to pay him a bonus, but that the term is ambiguous as to the bonus amount and how it is computed. Therefore, Shafer contends, interpreting this ambiguous term requires examination of extrinsic evidence. In support of his claim that a bonus was guaranteed in the agreement, Shafer first points to the contract language

itself, whereby the language at issue, "Bonus to Be Determined," is found as a subsection of the larger section "Salary." The placement of this bonus provision within "Salary," Shafer contends, indicates that the bonus is intended to be a component of the overall salary. Put another way, the salary contains two components, a base salary, and a bonus.

In addition to the contract language itself, Shafer points to the circumstances leading up to the formation of the contract to help explain the bonus provision. Specifically, Shafer relies on the salary and bonus he received prior to entering the Agreement. Prior to execution of the Agreement, Shafer's total annual salary and bonus compensation was between $350,000 and $500,000. Shafer contends that there is no indication that the Agreement was intended to modify his preexisting salary and bonus arrangements. To this point, Shafer relies on the statement of Joseph Drum (the UGT employee who presented the contract to Shafer), that the Agreement was provided only to give Shafer a three-year employment term.

UGT asserts that the bonus provision gave it complete discretion to determine whether to give Shafer a bonus in any year and the amount. UGT also maintains that Shafer is wrong to rely on extrinsic evidence because the bonus term is unambiguous. Further, UGT points to the provision of the Agreement entitled "Amendment," which provides that the terms of the Agreement are the complete and final statement of the agreement between the parties. Thus, UGT contends that Shafer cannot rely on evidence of any prior agreement to construe the bonus provision of the Agreement, as this would violate the very terms of the Agreement.

In addition to owed bonuses, Shafer also claims that UGT withheld certain post-termination benefit payments. These include $15,504 for COBRA expenses, $11,000 for his auto allowance, and $12,467 in vacation pay, all for the eleven month period from the date of Shafer's termination through November 23, 2008 (the end of the Agreement term). Both parties

agree that Shafer's monthly COBRA medical coverage payments were $848 (which, calculated for the aforementioned eleven month period, amounts to a total of $9,328). However, Shafer maintains that he is entitled to tax free payments. Such payments, when grossed up for the effects of taxation, amount to a total of $15,504.

UGT contends that Shafer's post-termination compensation for benefits, in the amount of $21, 472, adequately covers all compensation owed under the Agreement, including medical payments (COBRA) and other "benefits." UGT denies that Shafer is entitled to a car allowance for 2008 since Shafer did not use his own car to conduct any business for UGT during that year. Even if a car allowance were owed, UGT asserts that this would be covered by the compensation package. UGT also rejects Shafer's claim that he is owed vacation pay for 2008, arguing that Shafer was no longer working for the company or accruing additional vacation days. UGT argues that the "Termination without Cause" provision of the Agreement does not require UGT to continue payment of Shafer's car allowance or vacation days.

## II. DISCUSSION

**A. Summary Judgment Standard of Review**

Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

The party moving for summary judgment has the burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325. If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine fact issue exists and a trial is necessary. Id. at 324. In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate. Id. at 251-52.

**B. Breach of Contract with Respect to the 2006 and 2007 Bonuses and Failure to Pay a 2008 Bonus**

The court will turn first to Shafer's contention that the Agreement unambiguously provides for the payment of a bonus each year, that only the amount of the bonus is ambiguous, and that the ambiguity must be resolved by extrinsic evidence. UGT, on the other hand, contends that the Agreement unambiguously gives it complete discretion as to whether any bonus should be given in any year and, if so, what the amount should be.

7

"[C]ontract construction – the determination of the legal relations of the parties to the contract – is a question of law." Tracinda Corp. v. DaimlerChrysler AG, 502 F.3d 212, 229 (3d Cir. 2007) (internal citations and quotations omitted).  Therefore, a ruling interpreting the terms of a contract, or the issue of whether it binds a given party, forms an appropriate ground for summary judgment on claims arising out of that contract.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986) (summary judgment is appropriate "if, under the governing law, there can be but one reasonable conclusion as to the verdict.").

Contracts should be construed according to the plain and ordinary meaning of their terms. See, e.g. Bergholm v. Peoria Life Ins. Co., 284 U.S. 489, 492 (1932); Imperial Life Ins. Co. v. Coos County, 151 U.S. 452, 463 (1894); J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 364 (3d Cir. 2004).  "When in the context of the document itself and the transaction to which it pertains the terminology employed, despite a facile simplicity, actually is not free from doubt as to its meaning, the party is permitted to introduce proof of extrinsic circumstances bearing on the alleged proper interpretation of the language used."  Schor v. FMS Financial Corp., 357 N.J. Super. 185, 192 (App. Div. 2002).  Such evidence, however, may not be used to modify or enlarge the agreement.  See, e.g. Conway v. 287 Corporate Center Assoc., 187 N.J. 259 (2006).

On examination of the Agreement, the court finds the bonus provision, "Bonus to Be Determined," ambiguous.  "An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations."  Kaufman v. Provident Life and Cas. Ins. Co., 828 F. Supp. 275, 283 (D.N.J. 1992).  The bonus provision in this case is subject to two competing interpretations: (1) UGT maintains complete discretion over whether to provide any bonus; or (2) a bonus must be provided, but UGT maintains discretion over the amount.

8

Extrinsic evidence must therefore be examined to interpret the meaning of the term "Bonus to Be Determined."

In interpreting the bonus provision, Shafer argues that the extrinsic evidence reveals the agreement provides for a bonus of three to five percent of agency profits. This, on top of Shafer's base salary of $175,000, would place his overall salary compensation between $350,000 and $500,000 per year. In support of this contention, Shafer relies primarily on evidence of his salary and bonus arrangements enjoyed prior to execution of the Agreement. The extrinsic evidence upon which Shafer relies is (1) an oral agreement he had with John Dwyer, UGT's majority stockholder, in 2004 when he was originally hired that he would receive an annual salary of $170,000 and a bonus of three to five percent of agency profits, to bring his total annual compensation package to between $350,000 and $500,000; (2) Shafer's 2004 bonus, payable in February 2005, of $150,000, which brought his 2004 earnings to within the negotiated salary range; (3) awarding an employee a bonus for the calendar year and paying it in the subsequent year is an industry practice; (4) Shafer accepted without protest a bonus for 2005 that, when added to his salary, was somewhat less than $350,000 because he was dealing with new and unknown management; and (5) faced with the award of only a $75,000 bonus in 2006, Shafer acquiesced because he was faced with the non-compete clause if he quit.

Shafer's reliance on earlier agreements is unavailing. Section 14 of the Agreement, entitled "Amendment," explicitly disavows the incorporation of terms from any other agreement by providing that the Agreement is "the entire agreement of the parties," and it "supersedes and replaces any prior agreements or understandings." Regarding statements of an agreement's integration, the Court of Appeals has held that, "if the writing contains a statement to the effect that it is the complete and final statement of the agreement, the courts may give the statement

9

conclusive effect in determining integration." United States v. Clementon Sewerage Authority, 365 F.2d 609, 614 n.1 (3d Cir. 1966). Thus, the contract itself prevents Shafer, and this court, from relying on extrinsic evidence of any oral or written agreements made prior to the Agreement.

Although Shafer contends the Agreement requires a bonus, his own deposition is in direct contrast to this claim. In his deposition, Shafer states that, "when [the Agreement] said bonus to be determined it was up to them to decide what they wanted to do and how they wanted to administer it." (Safer Dep., 43: 8-13) When asked specifically whether the company had the discretion to provide a bonus in each particular year, Shafer responded "Yes." (Id.) Later in his deposition, Shafer reiterates this interpretation of the bonus provision by noting that UGT "had the determination to make [his bonus] what they wanted to. They could have made it a dollar if they wanted to."[2]

Shafer argues that his deposition statements regarding the bonus provision were speaking specifically to the fact that, given the Agreement's one year non-compete clause, he was at the company's mercy, and was forced, under economic duress, to accept whatever bonus they chose to give him. The Court rejects the claim that Shafer was placed in a state of economic duress. To satisfy a claim for economic duress, the party (1) "must show that he has been the victim of a wrongful or unlawful act or threat," and (2) "such act or threat must be one which deprives the victim of his unfettered will." Cont'l Bank of Pa. v. Barclay Riding Academy, 459 A.2d 1163, 1175 (N.J. 1983) (citing 13 S. Williston, Contracts, § 1617 at 704 (3d ed. 1970)). The wrongful act must encompass more than "merely taking advantage of another's financial difficulty." Id. at

---

[2] Neither party furnished evidence of this final deposition statement. However, though Shafer contends that the previous deposition statements were taken out of context, he has failed to argue that this particular quote is inaccurate. Therefore, the Court will consider this statement to be accurate.

1176.  Rather, to establish economic duress, one's financial difficulty must have been "contributed to or caused by the one accused of coercion."  Id.

In the present case, the record does not indicate that Shafer was in a state of financial hardship.  His claim is rather predicated on the belief that the non-compete clause of the Agreement prevented him from leaving the company.  This amounts only to a fear that he would be unable to obtain employment comparable to that which he was currently occupying.  Furthermore, the court in Cont'l Bank notes that there is usually no economic duress where there is adequacy of consideration.  Id.  Here, in return for his compliance with the non-compete clause, as well as for his other work duties and responsibilities, Shafer received, over the course of his time working under the Agreement for UGT (including his termination package), more than $1.6 million in salary, bonus, and benefits.  This is adequate consideration for Shafer's obligation under the Agreement.  Absent any evidence in the record that Shafer was in a state of financial hardship, and that this hardship was caused by UGT, the claim for economic duress must fail.

Whether or not the non-compete clause placed Shafer in a state of economic duress after he signed the Agreement does not speak to Shafer's state of mind at the time he signed it.  It is at this stage that a claim of economic duress would become relevant to this case.  Shafer had several viable options before him when he was presented with the Agreement.  He could have, for example, pursued further negotiations to clarify the terms of the Agreement.  Shafer was also free to abstain from signing the Agreement altogether, and either continue working under his previous arrangement (if UGT was also willing to pursue this option) or leave the company completely.  If he had chosen the latter option, Shafer would not have been bound by the non-compete clause and would have been free to pursue employment in any field.  As a sophisticated

and experienced business person, Shafer was capable of carefully reading and understanding the terms, and discussing or negotiating such terms before signing the Agreement. See, e.g., MetLife Capital Fin. Corp. v. Washington Ave. Associates L.P., 732 A.2d 493, 496 (observing that a liquidated damages provision in a commercial contract between "sophisticated parties" is presumed to be reasonable unless the party challenging the clause proves it is unreasonable). Shafer, therefore, was also not under a state of economic duress at the time he signed the Agreement, at which time it was completely within his control to avoid any unfavorable contract terms.

Shafer is also incorrect to rely on Bryson v. Brand Industries, Inc., 621 F.2d 556 (3d Cir. 1980) for the proposition that "an employee's acknowledgment in a deposition that his employer had the unfettered power whether or not to award a bonus, is not a binding admission if a fair reading of the plaintiff's deposition testimony shows the plaintiff believed there was a 'real obligation' to pay a bonus, but its payment and amount depended on conditions outside of his control." This statement is an incorrect characterization of the Court of Appeals's opinion in Bryson. The Court recounts the plaintiff's statement in his deposition "that no minimum amount of bonus was guaranteed because the bonus was tied to his work performance." Bryson, 621 F.2d at 560. The Court concluded that the plaintiff's statement "suggests that the bonus was a real obligation, conditioned on a factor outside the defendant's control." Id. The terms of the bonus provision in Bryson gave the employer an affirmative framework from which to calculate the bonus. It was not, therefore, within the employer's complete discretion to calculate the bonus. This conclusion, however, does not speak to whether the plaintiff's deposition statement was binding. Rather, the court in Bryson was merely using the plaintiff's statement to interpret the bonus provision. Using the same method here, this Court must conclude that Shafer's

deposition testimony supports the conclusion that UGT had complete discretion to determine Shafer's bonus.

In sum, Shafer is not entitled to a bonus adjustment for 2006 and 2007, nor is he entitled to a bonus for 2008. Although the court finds the bonus provision to be ambiguous, examination of the extrinsic evidence and Shafer's candid admission reveal the provision "Bonus to Be Determined" to give UGT complete discretion to determine the existence and amount of Shafer's bonus in any given year. As a result, it was within UGT's discretion to set any amount for Shafer's bonus, and therefore he is not entitled to any additional compensation. The compensation package Shafer received, which contained a bonus for 2007 in the amount of $143,528, in addition to the bonuses he received in the years preceding his termination, are what was owed to him under the terms of the Agreement. Summary judgment will be granted in favor of UGT on the portion of Count One relating to the 2008 bonus and on the portion of Count Two relating to earlier bonuses.

**C. Breach of Contract for Failure to Pay Post-Termination Benefits**

In addition to his claims relating to his bonuses, Shafer also contends that UGT wrongfully withheld certain post-termination benefits owed under the Agreement, including the full amount of owed tax free COBRA expenses ($15,504), his car allowance at $1,000 per month for the eleven month period following his termination through the end of the Agreement term ($11,000), and four weeks paid vacation for 2008 ($12,467 at an annual salary rate of $176,800). This amounts to a total of $38,971, but since Shafer's termination package included $21,472 for medical expenses and other "benefits," Shafer argues he is owed the difference between the two figures, in the amount of $17,499.

13

Under the terms of the section "Termination," the subsection "Without Cause" provides that Shafer is entitled, "for the number of years (including partial years) remaining in the Term, [to] all employee benefit plans and programs in which the Employee was entitled to participate immediately prior to the date of termination." Shafer contends that each of the benefits he seeks compensation for (COBRA, auto allowance, and paid vacation) are covered by this provision. The question for each, therefore, is whether it is considered a "benefit plan[] or program[]"covered by the Termination provision.

### *i. COBRA Expenses*

At the time Shafer's employment was terminated, the health insurance coverage he enjoyed during his employment was converted to COBRA, at a cost to Shafer of $848 per month. Both parties agree that a portion of Shafer's termination package was intended to cover these COBRA payments. UGT asserts these payments amount to a total of $9,328, reflecting an eleven month payment (January through November 2008) at $848 per month. Shafer, however, insists he is entitled to a total of $15,504, reflecting the cost to him grossed up for the effects of taxation.

Although after his termination Shafer was covered under COBRA and not the company medical plan, as is provided for by the contract under the provision "Other Compensation and Fringe Benefits," UGT is still obligated to compensate these costs. The Termination section of the Agreement provides that, "in the event that the Employee's participation in any such plan or program is prohibited, the Company shall, at its expense, arrange to provide the Employee with benefits substantially similar to those which the Employee would otherwise have been entitled to receive." Since COBRA was a benefit substituted for the company's medical plan once Shafer was terminated, the terms of the Termination provision provide that he is at least entitled to some

14

form of compensation for these COBRA payments. There is no indication in the contract itself, however, nor in any supplemental evidentiary materials, to indicate that Shafer had an agreement with UGT to receive compensation for COBRA payments grossed up for the effects of taxation. As a result, Shafer is only entitled to $9,328 for the eleven month period following his termination, based on a monthly COBRA payment of $848.

### *ii. Auto Allowance*

Shafer next claims that UGT owes him unpaid auto allowance payments for the eleven month period in 2008 leading up to the end of the Agreement term. The terms of the Agreement guarantee Shafer an auto allowance of $750 per month, but Shafer argues that he is entitled to total compensation of $11,000, representing a $1,000 per month allowance, because this is the amount he was receiving at the time of his termination. The Agreement provides that its terms may be "amended only by a written document signed by both parties." No written documentation supports Shafer's claim that his Agreement was amended to provide for a $1,000 per month auto allowance. In the absence of such documentation, the contract language is dispositive. Thus, if money for a car allowance is owed under the terms of the Agreement, the amount would reflect an allowance of $750 per month, or a total of $8,250.

UGT argues that Shafer is not entitled to an auto allowance for 2008, but insists that even if he was entitled to it, this would be covered by the termination compensation package. The provision providing Shafer with an auto allowance is found under the section entitled "Other Compensation and Fringe Benefits." Since the auto allowance is found under the section regarding "benefits," it is reasonable to conclude that this is included in the "benefit plans or programs" mentioned in the "Termination Without Cause" provision. A plain reading of the contract, therefore, leads to the conclusion that Shafer is entitled to an auto allowance of $750

15

per month for the eleven months in 2008 leading up to the end of the Agreement term in November. UGT therefore owes Shafer auto allowance compensation in the amount of $8,250. It is undisputed that UGT paid Shafer $21,472 in addition to his 2008 salary and 2007 bonus as part of his compensation package. Since $9,328 of this goes towards COBRA payments, this leaves an additional $12,144 already received by Shafer, which more than covers the auto allowance.

### *iii. Paid Vacation*

Finally, Shafer contends that UGT owes him four weeks vacation pay in the sum of $12,467 for the period beginning with the date of his termination through November 23, 2008, the end of the Agreement term. UGT counters that Shafer did not accrue vacation days in 2008, nor does the "Termination" provision of the Agreement provide for continued payment of vacation days after employment has been terminated. Section five of the Agreement, entitled "Vacation," provides four weeks paid vacation for each year of the term of the Agreement. The question is whether this is considered an "employee benefit plan[] or program[]" under the "Termination" provision.

The relevant provision of the Agreement is once again "Termination," and specifically, the subsection entitled "Without Cause." As discussed above, this provision provides for Shafer's continued benefit in "all employee benefit plans and programs in which the Employee was entitled to participate immediately prior to the date of termination." An entire section of the Agreement is devoted to "Other Compensation and Fringe Benefits." A plain reading of the contract leads this Court to conclude that the benefits contained in this section of the Agreement are the ones referenced as "benefit plans and programs" in the "Termination" provision. The information regarding vacation pay is not found within this section. Rather, it is a separate

16

section of its own.  If paid vacation was intended to be considered a "benefit," it would have surely been included as an additional subsection of "Other Compensation and Fringe Benefits." Since it was not, it is not covered within the "Termination" provision, and therefore vacation pay is not owed to Shafer for 2008.

In sum, UGT does not owe Shafer any additional payments for post-termination benefits. His COBRA and auto allowance reimbursements were covered in the compensation package he already received from UGT.  Furthermore, Shafer is not entitled to paid vacation days for 2008 because this was not included in the "benefit plans and programs" referenced in the "Termination" section of the Agreement.  Summary judgment will be granted in favor of UGT on the portion of Count One relating to benefits.

## III.  CONCLUSION

For the reasons set forth above, UGT's motion for summary judgment on Counts One and Two of the Complaint will be granted, and Counts One and Two will be dismissed with prejudice.  Plaintiff having abandoned his claim against Defendant Gary Kermott, Count Three of the Complaint will be dismissed with prejudice.

The court will enter an order implementing this opinion.


　　　　　　　　　　　　　　　　　　　**s/ Dickinson R. Debevoise**_____
　　　　　　　　　　　　　　　　　　　DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: July 7, 2009