<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOHN B. SHAFER,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>UNITED GENERAL TITLE INSURANCE COMPANY, ET AL.<br><br>　　　　　　Defendants. | Civ. No. 08-2884 (DRD)<br><br>**O P I N I O N** |

*Appearances by:*

SCHABLIK & KNAPP, P.A.
by: Noel E. Schablik, Esq.
35 Waterview Boulevard, 1st Floor
Parsippany, NJ 07054

　　*Attorneys for Plaintiff*

DAY PITNEY, LLP
by: Theresa A. Kelly, Esq.
P.O. Box 1945
Morristown, NJ 07962

　　*Attorneys for Defendants*

**<u>DEBEVOISE, Senior District Judge</u>**

　　Plaintiff, John B. Shafer, moves for reconsideration of the Court's July 7, 2009 Opinion and Order (1) granting summary judgment in favor of Defendant United General Title Insurance Company ("UGT"), and (2) denying Mr. Shafer's cross-motion for summary judgment. In his

Complaint, Mr. Shafer alleged that UGT[1] breached his employment contract by withholding bonus payments and various employee benefits – including medical insurance and vacation allowances – for the period between Mr. Shafer's termination on December 31, 2007 and the date on which his employment contract was to end, November 23, 2008.

In support of his pending request for reconsideration, Mr. Shafer argues that the Court mischaracterized his deposition testimony by holding that he had admitted that UGT had unfettered discretion over the amount of his bonus. After a thorough review of Mr. Shafer's deposition testimony, the Court finds Mr. Shafer's argument baseless. Therefore, the pending Motion for Reconsideration will be denied.

## I.  BACKGROUND

The facts underlying this dispute are laid out in detail in the Court's July 7, 2009 Opinion. In order to add context to today's decision, some of the facts included in that ruling are repeated below.

**A. The Employment Agreement**

Mr. Shafer is a former employee of UGT. In November 2005, he and the company entered into a written Employment Agreement ("the Agreement") governing the terms of his salary and benefits. The Agreement, which was to remain effective through November 23, 2008, included a "Salary" section stating that:

> During the Term, the Company shall pay the Employee a <u>minimum base annual salary</u>, before deducting all applicable withholdings, of $175,000.00 per year, payable at the times and in the manner dictated by the Company's standard

---

[1] Mr. Shafer's original Complaint named three additional Defendants: (1) the First American Corporation, (2) First American Title Insurance Company, and (3) Gary Kermott. In his arguments relating to the Cross-Motions for Summary Judgment, Mr. Shafer represented to the Court that he wished to abandon his claims against all Defendants other than UGT. Based on that representation, the Court dismissed those claims with prejudice in its July 7, 2009 Order. Mr. Shafer has not moved for reconsideration of the dismissal of his claims against all non-UGT defendants. Therefore, today's ruling will deal only with the claims asserted against UGT.

2

payroll policies. Such minimum base annual salary may be periodically reviewed and increased (but not decreased) at the discretion of the Compensation Committee of the Board of Directors to reflect, among other matters, cost of living increases and performance results.

      (a) Bonus To Be Determined

Other than the subheading excerpted above stating "Bonus To Be Determined," the Agreement included no information on whether UGT was required to pay a yearly bonus. Nor did the Agreement specify any particular amount of such bonuses in the event any were paid.

      A separate section of the Agreement governed Mr. Shafer's "Other Compensation and Fringe Benefits," providing for (1) "standard company benefits enjoyed by the Company's other top executives," (2) "medical and other insurance under the Company's medical plan" for Mr. Shafer and his dependants, and (3) a monthly car allowance of $750. A third section, titled "Vacation," specified that Mr. Shafer would receive four weeks of paid vacation leave each year.

      In consideration of the above-mentioned benefits and salary, Mr. Shafer agreed not to work for any other company engaged in competition with UGT for a period of one year after either (1) the expiration of the Agreement (in the event that he chose not to extend its period of effectiveness), or (2) his voluntary departure prior to November 23, 2008. Specifically, the Agreement included a section titled "Non Competition After Employment Term," which stated in relevant part that:

> [F]or a period of one year after this Agreement is terminated or the Employee leaves the employment of the Company for any reason whatsoever, except as otherwise stated hereinbelow, the Employee agrees (i) not to become an employee, consultant, advisor, principal, partner or substantial shareholder of any firm or business that in any way competes with the Company in any of its presently-existing or then-existing products and markets; and (ii) not to solicit any person or business that was at the time of such termination and remains a customer or prospective customer, or an employee of the Company. Notwithstanding any of the foregoing provisions to the contrary, the Employee shall not be subject to the restrictions set forth in this Section [] under the following circumstances:

>(a) If the Employee's employment with the Company is terminated without cause;
>
>(b) If the Employee's employment with the Company is terminated as a result of the Company's unwillingness to extend the Term of this Agreement.

The portion of the Agreement governing "Termination" stated that, if UGT fired Mr. Shafter without cause, it would "continue to pay the Employee an annual amount equal to the product of the Employee's minimum annual base salary in effect as of the date of termination, plus the bonuses paid or to be paid for all years during the term of the agreement." Furthermore, the Agreement obligated UGT in the event of termination without cause to "maintain in full force and effect for the continued benefit of the Employee for the number of years (including partial years) remaining in the Term, all employee benefit plans and programs which the Employee was entitled to participate immediately prior to the date of termination," unless doing so would violate the terms of those programs.

Finally, the Agreement contained a section titled "Amendment," which stated that:

> This Agreement contains, and its terms constitute, the entire agreement of the parties, and it may be amended only by a written document signed by both parties to this Agreement. This Agreement supersedes and replaces any prior agreements or understandings between the parties with respect to the subject matter thereof.

## B. Termination and Complaint

Mr. Shafer was informed on December 14, 2007 that his employment at UGT would be terminated at the end of that month. UGT conceded in their arguments on the earlier Motions for Summary Judgment that Mr. Shafer was fired due to economic circumstances that forced the company to eliminate his position, and that his post-termination benefits were therefore governed by the portion of the Agreement dealing with "Termination Without Cause." Shortly after being informed of his termination, Mr. Shafer received a lump-sum separation payment that included

(1) his 2008 annual salary in the amount of $157,760 (for the eleven months in 2008 covered under the Agreement); (2) his 2007 bonus in the amount of $143,528; and (3) $21,472, representing payment for COBRA medical coverage through the duration of the Agreement, along with a miscellaneous "benefit" reimbursement under the Agreement, which included a $750 per month automobile allowance.

On April 21, 2008, Mr. Shafer filed a Complaint in the Superior Court of New Jersey asserting breach of contract claims against UGT on the grounds that (1) the company had not included his 2008 bonus in the lump-sum payment made after his termination and had underpaid his 2007 bonus by approximately $44,341, and (2) the "benefit" reimbursement paid after his termination did not include the four weeks of paid vacation during 2008 provided for under the Agreement, and had not been "grossed up" to make up for the fact that he would be required to pay taxes on his medical coverage and automobile allowance. A mere eight days later, on April 29th, Mr. Shafer filed an Amended Complaint in which he asserted the same claims, but explicitly invoked the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. Based on the federal nature of Mr. Shafer's claims, along with the fact that the parties are citizens of different states and the amount in controversy is greater than $75,000, UGT removed to this Court on June 11, 2008.

**C.  July 7, 2009 Opinion**

After the completion of discovery in April 2009, UGT moved for summary judgment. With respect to Mr. Shafer's first claim – that the company breached its obligations by failing to pay him a bonus for 2008 and paying $44,341 less than he was owed for his 2007 bonus – UGT contended that the "Bonus To Be Determined" provision in the Agreement gave it complete discretion over whether to make such payments. Mr. Shafer countered that the bonus provision

5

was ambiguous, and should be interpreted in light of extrinsic evidence that (1) his bonuses in past years had been between two and six percent of the company's pre-tax profit for the geographic areas assigned to him (except in 2006, when Mr. Shafer was awarded a bonus of $75,000 that he testified he accepted without protest because the non-compete clause in his contract left him with no other choice), and (2) Joe Drum, the UGT employee who negotiated the Agreement on behalf of the company, testified that it was his understanding that Mr. Shafer's bonuses during the period from 2005 to 2008 were to be set at two percent of pre-tax profits in the geographic regions for which he was responsible. UGT, in turn, argued that evidence of prior bonuses and Mr. Drum's understanding of the contract were inadmissible in light of the provision in the Agreement stating that it "supersede[d] and replace[d] any prior agreements or understandings between the parties."

Regarding Mr. Shafer's second claim – that the lump-sum payment he received after being fired was inadequate because it did not include vacation pay and had not been "grossed up" to account for taxes – UGT asserted that the payment made after Mr. Shafer's termination was sufficient to satisfy its duties under the Agreement. That claim was premised on UGT's argument that (1) Mr. Shafer was not entitled to an automobile allowance because he did not work for the company during 2008, and therefore did not use a car to carry out his duties in that year, and (2) Mr. Shafer did not accrue vacation days during 2008 because such days were subject to a formula that specified that they would be earned after a given period of work, and he did not work for the company during 2008.

In its Opinion, the Court examined at length Mr. Shafer's claims before holding that the portion of the Agreement stating "Bonus To Be Determined" was ambiguous and could therefore be interpreted using extrinsic evidence. An examination of that evidence led the Court to

6

conclude that the bonus provision gave UGT discretion to set payment in any amount or withhold bonuses entirely.  In light of Mr. Shafer's current allegations that his arguments were not properly considered, the portion of the Court's July 7, 2009 Opinion in which it held that extrinsic evidence of understandings or practices utilized by the parties prior to entering the Agreement were not admissible as extrinsic evidence bears repeating at length:

> In interpreting the bonus provision, Shafer argues that the extrinsic evidence reveals the agreement provides for a bonus of three to five percent of agency profits.  This, on top of Shafer's base salary of $175,000, would place his overall salary compensation between $350,000 and $500,000 per year.  In support of this contention, Shafer relies primarily on evidence of his salary and bonus arrangements enjoyed prior to execution of the Agreement.  The extrinsic evidence upon which Shafer relies is (1) an oral agreement he had with John Dwyer, UGT's majority stockholder, in 2004 when he was originally hired that he would receive an annual salary of $170,000 and a bonus of three to five percent of agency profits, to bring his total annual compensation package to between $350,000 and $500,000; (2) Shafer's 2004 bonus, payable in February 2005, of $150,000, which brought his 2004 earnings to within the negotiated salary range; (3) awarding an employee a bonus for the calendar year and paying it in the subsequent year is an industry practice; (4) Shafer accepted without protest a bonus for 2005 that, when added to his salary, was somewhat less than $350,000 because he was dealing with new and unknown management; and (5) faced with the award of only a $75,000 bonus in 2006, Shafer acquiesced because he was faced with the non-compete clause if he quit.
>
> Shafer's reliance on earlier agreements is unavailing.  Section 14 of the Agreement, entitled "Amendment," explicitly disavows the incorporation of terms from any other agreement by providing that the Agreement is "the entire agreement of the parties," and it "supersedes and replaces any prior agreements or understandings."  Regarding statements of an agreement's integration, the Court of Appeals has held that, "if the writing contains a statement to the effect that it is the complete and final statement of the agreement, the courts may give the statement conclusive effect in determining integration."  <u>United States v. Clementon Sewerage Authority</u>, 365 F.2d 609, 614 n.1 (3d Cir. 1966).  Thus, the contract itself prevents Shafer, and this court, from relying on extrinsic evidence of any oral or written agreements made prior to the Agreement.
>
> Moreover, the Court addressed Mr. Shafer's deposition testimony in connection with its

determination that any bonuses were to be paid at the discretion of UGT.  In doing so, it

explicitly rejected Mr. Shafer's contention that the non-compete clause in the Agreement placed him in a state of economic duress, stating:

> Although Shafer contends the Agreement requires a bonus, his own deposition is in direct contrast to this claim. In his deposition, Shafer states that, "when [the Agreement] said bonus to be determined it was up to them to decide what they wanted to do and how they wanted to administer it." (Shafer Dep., 43: 8-13) When asked specifically whether the company had the discretion to provide a bonus in each particular year, Shafer responded "Yes." (Id.) Later in his deposition, Shafer reiterate[d] this interpretation of the bonus provision by noting that UGT "had the determination to make [his bonus] what they wanted to. They could have made it a dollar if they wanted to."
>
> Shafer argues that his deposition statements regarding the bonus provision were speaking specifically to the fact that, given the Agreement's one year non-compete clause, he was at the company's mercy, and was forced, under economic duress, to accept whatever bonus they chose to give him. The Court rejects the claim that Shafer was placed in a state of economic duress. To satisfy a claim for economic duress, the party (1) "must show that he has been the victim of a wrongful or unlawful act or threat," and (2) "such act or threat must be one which deprives the victim of his unfettered will." Cont'l Bank of Pa. v. Barclay Riding Academy, 459 A.2d 1163, 1175 (N.J. 1983) (citing 13 S. Williston, Contracts, § 1617 at 704 (3d ed. 1970)). The wrongful act must encompass more than "merely taking advantage of another's financial difficulty." Id. at 1176. Rather, to establish economic duress, one's financial difficulty must have been "contributed to or caused by the one accused of coercion." Id.
>
> In the present case, the record does not indicate that Shafer was in a state of financial hardship. His claim is rather predicated on the belief that the non-compete clause of the Agreement prevented him from leaving the company. This amounts only to a fear that he would be unable to obtain employment comparable to that which he was currently occupying. Furthermore, the court in Cont'l Bank notes that there is usually no economic duress where there is adequacy of consideration. Id. Here, in return for his compliance with the non-compete clause, as well as for his other work duties and responsibilities, Shafer received, over the course of his time working under the Agreement for UGT (including his termination package), more than $1.6 million in salary, bonus, and benefits. This is adequate consideration for Shafer's obligation under the Agreement. Absent any evidence in the record that Shafer was in a state of financial hardship, and that this hardship was caused by UGT, the claim for economic duress must fail.
>
> Whether or not the non-compete clause placed Shafer in a state of economic duress after he signed the Agreement does not speak to Shafer's state of mind at the time he signed it. It is at this stage that a claim of economic duress would become relevant to this case. Shafer had several viable options before him when

8

he was presented with the Agreement. He could have, for example, pursued further negotiations to clarify the terms of the Agreement. Shafer was also free to abstain from signing the Agreement altogether, and either continue working under his previous arrangement (if UGT was also willing to pursue this option) or leave the company completely. If he had chosen the latter option, Shafer would not have been bound by the non-compete clause and would have been free to pursue employment in any field. As a sophisticated and experienced business person, Shafer was capable of carefully reading and understanding the terms, and discussing or negotiating such terms before signing the Agreement. See, e.g., MetLife Capital Fin. Corp. v. Washington Ave. Associates L.P., 732 A.2d 493, 496 (observing that a liquidated damages provision in a commercial contract between "sophisticated parties" is presumed to be reasonable unless the party challenging the clause proves it is unreasonable). Shafer, therefore, was also not under a state of economic duress at the time he signed the Agreement, at which time it was completely within his control to avoid any unfavorable contract terms.

Based on those findings, the Court ruled that "it was within UGT's discretion to set any amount for Shafer's bonus … therefore he is not entitled to any additional compensation," and granted summary judgment in favor of UGT on Mr. Shafer's bonus claims. Similarly, the Court found no merit in Mr. Shafer's second claim – that the lump-sum payment he received after being fired was inadequate because it did not include vacation pay and had not been "grossed up" to account for taxes – and granted summary judgment in favor of UGT on all claims relating to Mr. Shafer's COBRA medical benefits, auto allowance, and vacation days.

## II.  DISCUSSION

As a preliminary matter, the Court notes that Mr. Shafer has not moved for reconsideration of its second ruling – that the lump-sum payment remitted by UGT shortly after Mr. Shafer was terminated was adequate to fulfill its duties to provide COBRA medical benefits under the Agreement, and that Mr. Shafer was not entitled to an auto allowance or vacation pay for 2008. Rather, the pending motion is addressed solely to Mr. Shafer's argument that his 2007 bonus was approximately $44,341 less than he was owed for that year, and does not deal with his previous allegations relating to UGT's refusal to pay a bonus for 2008 or the sufficiency of the

lump-sum benefits payment made shortly after his termination. Therefore, the Court need only address the propriety of its prior ruling that the "Bonus To Be Determined" provision in the Agreement gave UGT discretion to set any amount it saw fit for Mr. Shafer's bonus, and the 2007 payment thus complied with the contract. In order to properly address that question in the context of a motion for reconsideration, the Court's earlier ruling must be examined in light of the standard of review applicable to such requests.

## A. Standard of Review

"[I]t is well-established in this district that a motion for reconsideration is an extremely limited procedural vehicle." Resorts Int'l v. Greate Bay Hotel & Casino, 830 F. Supp. 826, 831 (D.N.J. 1992). As such, a party seeking reconsideration must satisfy a high burden, and must "rely on one of three major grounds: (1) an intervening change in controlling law; (2) the availability of new evidence not available previously; or (3) the need to correct clear error of law or prevent manifest injustice." North River Ins. Co. v. CIGNA Reins. Co., 52 F.3d 1194, 1218 (3d Cir. 1995).

Since the evidence relied upon in seeking reconsideration must be "newly discovered," a motion for reconsideration may not be premised on legal theories that could have been adjudicated or evidence which was available but not presented prior to the earlier ruling. See Id. Local Civil Rule 7.1(i), which governs such motions, provides that they shall be confined to matter[s] or controlling decisions which the party believes the Judge or Magistrate Judge has "overlooked." The word "overlooked" is the dominant term, meaning that except in cases where there is a need to correct a clear error or manifest injustice, "[o]nly dispositive factual matters and controlling decisions of law which were presented to the court but not considered on the original motion may be the subject of a motion for reconsideration." Resorts Int'l, 830 F. Supp.

at 831; see also Egloff v. N.J. Air Nat'l Guard, 684 F. Supp. 1275, 1279 (D.N.J. 1988); Florham Park Chevron, Inc. v. Chevron U.S.A., Inc., 680 F. Supp. 159 (D.N.J. 1988); Pelham v. United States, 661 F. Supp. 1063, 1065 (D.N.J. 1987).

**B. The Pending Motion**

Mr. Shafer does not claim that there has been any change in the controlling law since the court's July 7, 2008 Opinion. Nor does he allege "the availability of new evidence not available previously." See North River, 52 F.3d at 1218. Therefore, he must demonstrate "the need to correct clear error of law or prevent manifest injustice" in order to prevail. Id. He has not done so.

The contention on which Mr. Shafer's motion is premised – that the Court impermissibly ignored portions of his deposition testimony tending to show that he accepted a bonus of less than two percent of pre-tax profits for the areas under his supervision in 2006 only because the non-compete clause in the Agreement placed him in a state of economic duress – is rebutted by even a cursory review of the Court's prior ruling. The Court specifically considered Mr. Shafer's interpretation of his deposition testimony and rejected his economic duress argument, stating:

> Shafer argues that his deposition statements regarding the bonus provision were speaking specifically to the fact that, given the Agreement's one year non-compete clause, he was at the company's mercy, and was forced, under economic duress, to accept whatever bonus they chose to give him. … To satisfy a claim for economic duress, the party (1) "must show that he has been the victim of a wrongful or unlawful act or threat," and (2) "such act or threat must be one which deprives the victim of his unfettered will." Cont'l Bank of Pa. v. Barclay Riding Academy, 459 A.2d 1163, 1175 (N.J. 1983) (citing 13 S. Williston, Contracts, § 1617 at 704 (3d ed. 1970)). The wrongful act must encompass more than "merely taking advantage of another's financial difficulty." Id. at 1176. Rather, to establish economic duress, one's financial difficulty must have been "contributed to or caused by the one accused of coercion." Id.

11

> In the present case, the record does not indicate that Shafer was in a state of financial hardship. His claim is rather predicated on the belief that the non-compete clause of the Agreement prevented him from leaving the company. This amounts only to a fear that he would be unable to obtain employment comparable to that which he was currently occupying. Furthermore, the court in Cont'l Bank notes that there is usually no economic duress where there is adequacy of consideration. Id. Here, in return for his compliance with the non-compete clause, as well as for his other work duties and responsibilities, Shafer received, over the course of his time working under the Agreement for UGT (including his termination package), more than $1.6 million in salary, bonus, and benefits. This is adequate consideration for Shafer's obligation under the Agreement. Absent any evidence in the record that Shafer was in a state of financial hardship, and that this hardship was caused by UGT, the claim for economic duress must fail.

In fact, the Court's conclusion that UGT had discretion under the Agreement over whether to provide bonus payments is supported by the very portions of Mr. Shafer's deposition testimony that he contends in the pending motion demonstrate that his statements were taken out of context in the July 7, 2009 Opinion. For example, Mr. Shafer points to testimony in which he stated:

> I had no idea what my bonus plan was, but I signed a three year contract with one year non-compete language, so I was stuck and couldn't go anywhere. Once [UGT] had me sign the contract for three years they could determine anything they wanted to, knowing that I couldn't go anywhere because of the non-compete for a year. …

Had the Court considered that statement, Mr. Shafer contends, "the ineluctable conclusions [sic] would have been that there was a dispute of fact as to what the parties understood the ambiguous bonus language to mean." The Court disagrees. A reading of the testimony above clearly shows that Mr. Shafer understood the contract to give UGT total discretion over his bonuses – he may have found the terms unfavorable, but his dissatisfaction with the deal that resulted from the arms-length bargaining between himself and the company is no basis for seeking an award from this Court that would confer a greater benefit on him than allowed under the Agreement. As stated in the prior ruling:

> Shafer had several viable options before him when he was presented with the Agreement. He could have, for example, pursued further negotiations to clarify the terms of the Agreement. Shafer was also free to abstain from signing the Agreement altogether, and either continue working under his previous arrangement (if UGT was also willing to pursue this option) or leave the company completely. If he had chosen the latter option, Shafer would not have been bound by the non-compete clause and would have been free to pursue employment in any field. As a sophisticated and experienced business person, Shafer was capable of carefully reading and understanding the terms, and discussing or negotiating such terms before signing the Agreement. See, e.g., MetLife Capital Fin. Corp. v. Washington Ave. Associates L.P., 732 A.2d 493, 496 (observing that a liquidated damages provision in a commercial contract between "sophisticated parties" is presumed to be reasonable unless the party challenging the clause proves it is unreasonable). Shafer, therefore, was also not under a state of economic duress at the time he signed the Agreement, at which time it was completely within his control to avoid any unfavorable contract terms.

Therefore, in light of the fact that Mr. Shafer's pending Motion for Reconsideration does not include any evidence tending to show that he was (1) "the victim of a wrongful or unlawful act or threat … which deprive[d him] of his unfettered will." See Cont'l Bank of Pa., 459 A.2d at 1175, the Court reiterates its rejection of his economic duress claim.

In addition to statements from his own deposition, Mr. Shafer points to the testimony of Joe Drum in support of his contention that the Court committed clear error in granting UGT summary judgment on his claims relating to the 2007 bonus. Specifically, Mr. Shafer claims that Mr. Drum's statement that, "as I explained to John, he was to receive two percent of the pre-tax profit for the territory over which he presided," is conclusive evidence that his 2007 bonus payment was $44,341 less than provided for under the Agreement. As with his claim of economic duress, Mr. Shafer's assertions relating to Mr. Drum's testimony were considered and rejected as meritless in the Court's prior opinion. The argument's persuasiveness has not increased since that ruling.

In its July 7, 2009 Opinion, the Court noted Mr. Drum's testimony, stating that:

13

> Shafer contends that there is no indication that the Agreement was intended to modify his preexisting salary and bonus arrangements. To this point, Shafer relies on the statement of Joseph Drum (the UGT employee who presented the contract to Shafer), that the Agreement was provided only to give Shafer a three-year employment term.

The Court ultimately ruled, however, that Mr. Drum's statements were evidence of a pre-contract understanding, and such understandings could not serve as the basis for interpreting the Agreement in light of its admonishment that "[t]his Agreement supersedes and replaces any prior agreements or understandings between the parties with respect to the subject matter thereof."

Mr. Shafer contends that Mr. Drum's statements were not indicative of a pre-contract understanding, but rather constitute conclusive evidence that the parties interpreted the Agreement to require bonus payments of at least two percent of pre-tax profits for the geographic regions under his supervision. That contention, however, is contradicted by (1) his own deposition testimony (as excerpted above), and (2) the fact that the company paid – and he accepted – a bonus of less than two percent in 2006.[2] Therefore, the Court finds that Mr. Shafer has not demonstrated that its earlier ruling constituted clear error, and his Motion for Reconsideration will be denied.

---

[2] It appears that the bonus Mr. Shafer accepted in 2005 may also have constituted less than two percent of the pre-tax profits for the areas he oversaw. However, neither party has provided the Court with the exact amount of profit earned in Mr. Shafer's regions during that year.

### III.  CONCLUSION

For the foregoing reasons, Mr. Shafer's Motion for Reconsideration is denied.  The Court will enter an Order implementing this Opinion.

 **s/ Dickinson R. Debevoise**
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: September 17, 2009